[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
January 8, 2001, the petitioner, the Commissioner of the Department of Children and Families ("DCF"), filed a petition pursuant to C.G.S. §17a-112 et seq. to terminate the parental rights of Michelle L. and Donald M. to their children Anthony M. and Donald M. Respondent mother's parental rights were terminated on November 6, 2001, following her failure to appear for trial. Anthony and Donald have a half-sibling, Tyler L., who was also the subject of a termination petition. Tyler L.'s father, Reme L., also failed to appear for trial and his parental rights were terminated on November 6, 2001. Respondent father of Anthony and Donald, Donald M., contests termination of his parental rights. Trial of this matter took place before this court on January 16 and 17, 2002 at the Regional Child Protection Session at the Middlesex J.D. Counsel for respondent father and counsel for the children submitted post-trial briefs on February 8, 2002. For the reasons stated below, the court finds in favor of the petitioner.
The two statutory grounds alleged against Donald M. in the petition were (1) that the children were found in a prior proceeding to have been neglected or uncared for and the father had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the ages and needs of the CT Page 5134 children, he could assume a responsible position in the lives of the children (C.G.S. § 17a-112 (j) (3) (B) (i)); and (2) that there is no-ongoing parent-child relationship with respect to the father that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral or educational needs of the children, and to allow further time for the establishment of the parent-child relationship would be detrimental to the best interest of the children. (C.G.S. § 17a-112 (j) (D)).
The court finds that notice of this proceeding has been provided in accordance with the provisions of the Practice Book. The court further finds that the Child Protection Session of the Superior Court, Juvenile Matters Division, has jurisdiction over the pending matter and that no action is pending in any other court affecting custody of the children.
"The termination of parental rights is defined as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his [or her] parent. . . . [As such, it] is a most serious and sensitive judicial action." (Citation omitted; internal quotation marks omitted.) In re Jonathan M.,255 Conn. 208, 231, 764 A.2d 739 (2001); In re Bruce R., 234 Conn. 194,200 (1995).
The termination of parental rights is governed by statute. C.G.S. § 17a-112. In a proceeding for termination of parental rights, the petitioner must prove a ground alleged in the petition, as of the date of filing the petition or the last amendment, by clear and convincing evidence. In re Joshua Z., 26 Conn. App. 58, 63 597 A.2d 842 (1991),cert. denied, 221 Conn. 901 (1992); In re Teresa S., 196 Conn. 18
(1985); Practice Book 33-1 et seq. Only one ground need be established for the granting of the petition. In re Juvenile Appeal (84-BC),194 Conn. 252, 258 (1984); In re Karrlo K., 44 Conn. Sup. 101, 106
(1994), aff'd, 40 Conn. App. 73 (1996).
Termination of parental rights trials proceed in two stages: the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established by clear and convincing evidence the existence of one or more of the statutory grounds as of the date the petition was filed or last amended. In re JuvenileAppeal, (84-AB), 192 Conn. 254, 264 (1984). "Pursuant to Practice Book § 33-3(a), in deciding the adjudicatory phase of the hearing for the termination of parental rights, the trial court's inquiry is limited to the events and facts preceding the filing of the petition for the termination of parental rights." In re Daniel C., 63 Conn. App. 339, 357
(2001). In this case, the petition was filed on January 8, 2001. However, "[i]n the adjudicatory phase, the court may rely on events CT Page 5135 occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree ofrehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." In re StanleyD., 61 Conn. App. 224, 230, 763 A.2d 83 (2000) (emphasis in original);see In re Latifa K., 67 Conn. App. 742, 748, ___ A.2d ___ (2002).
If at least one pleaded ground to terminate is found, the court proceeds to the disposition stage. The court must consider whether the facts, as of the last day of trial, establish, by clear and convincing evidence, that termination is in the child's best interest. Procedurally, the evidence as to both adjudicatory and dispositional phases is heard at the same trial without first determining if the state has proven a statutory ground for adjudication before consideration of the dispositional question. State v. Anonymous, 179 Conn. 155, 172-173,425 A.2d 939 (1979); In re Juvenile Appeal (84-BC), 194 Conn. 252, 258,479 A.2d 1204 (1984); In re Nicolina T., 9 Conn. App. 598, 602,520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987); In reEmmanuel M., 43 Conn. Sup. 108, 113, 648 A.2d 904, aff'd,35 Conn. App. 276, 278, 648 A.2d 881, cert. denied, 231 Conn. 915,648 A.2d 151 (1994). In re Eden F., 250 Conn. 674, 688-89, 741 A.2d 873
(1999)." In re Quanitra M., 60 Conn. App. 96, 102, 758 A.2d 863, cert.denied, 255 Conn. 903 (2000).
I. FACTS
Witnesses at trial included DCF workers, the children's therapists, foster mother of DJ (and formerly, Anthony), a clinical and forensic psychologist, DOC rehabilitation program counselors, and the respondent. The Court has considered the documentary evidence as well as the testimony of the witnesses. The credible evidence admitted at trial supports the following facts by clear and convincing evidence.
Anthony M. was born on February 1994 and Donald M., who is known as DJ, was born on July 1995. Both were born to Donald M. and Michelle M.[1]
Tyler L., Anthony and Donald's half-sibling, was born on October 1997. When Anthony was 5 months old in July 1994, he experienced his first foster placement when his mother, in a very intoxicated state, stabbed respondent father and took him to the emergency room with Anthony in her care. Anthony was briefly removed and then returned to his parents who then moved to Colorado. They returned after only a few months when sheriffs in Colorado began investigating respondent father on allegations of criminal conduct. When they returned to Connecticut, Anthony was again placed in foster care. When DJ was born in July, 1995, he tested positive for cocaine. His mother also tested positive for cocaine, barbiturates and valium. In November 1995, DJ was placed in foster care based on his CT Page 5136 mother's continued drug use, his father's arrests and the inability of either parent to care for him.
Respondent father was arrested in September, October and December 1995 on numerous burglary and larceny charges. He was incarcerated in July 1996 based on a number of convictions for burglary in the 3rd degree and criminal impersonation. In August, 1996, he was sentenced on charges of larceny in the first degree and probation violation. Michelle L. then permanently separated from him. With both Anthony and DJ in foster care, Michelle entered an inpatient drug treatment program where she met Reme L., father of Tyler who was born in October, 1997. In December 1997, as Anthony was approaching his fourth birthday, and DJ was approximately 2 1/2 years old, the boys were returned to their mother under an order of protective supervision. Michelle and Reme L. quickly returned to a life of alcohol and drug abuse, including heroin. Michelle and Reme moved to New Mexico in March 1998, taking the three children with them. For approximately 16 months, Anthony and DJ were exposed to severe abuse and neglect at the hands of both Michelle and Reme L. including physical and sexual abuse. Although only 4-5 years old, Anthony later reported being spanked, being forced to take cold showers, having his penis pulled and hurt and being injected with a syringe. DJ reported similar abuse.
The family returned to Connecticut and came to the attention of DCF again in April 1999, when DCF received a call to its hotline from a homeless shelter in Norwich. The caller reported that mother, Michelle L., and her husband, Reme L., were under the influence of drugs while at the shelter and that there were three children in their care who were not being supervised. The children were observed throwing things off the roof of the shelter while their mother slept. Based on DCF's investigation which revealed Michelle and Reme's active heroin use and failure to supervise the children, all three children were removed in May, 1999 on a 96-hour hold. An Order of Temporary Custody was issued by the court on May 12, 1999, (Mack, J.) Specific steps were issued by the court on the same date. Anthony, DJ and Tyler were found to be neglected and committed to DCF on August 25, 1999. (Mack, J.) On September 20, 2000, the court found that reasonable efforts to reunify the children with their parents were no longer appropriate. (Mack, J.)
Respondent father of Anthony and DJ, Donald M., was incarcerated when the children were placed in the care and custody of DCF in May 1999. Although respondent father made a request for visitation with his two sons, visits were not permitted because the children's therapists recommended no contact with respondent father in view of their instability at the time, the impact of the trauma they had experienced, and the fact that they really had no memory of their father and did not express a desire to see him. An administrative hearing was held in CT Page 5137 September, 1999 at which the decision to deny visitation as part of DCF's treatment plan was found to be appropriate based in part on the children's needs. Ex. 10. A second administrative hearing was held in October 2000 and February 2001, and in December 2001, the treatment plan, including denial of visitation, was again upheld based on the psychological evaluations by Dr. Robin Grant-Hall. Ex. 14.
When the children were placed in DCF care, Anthony and DJ were showing signs of having been sexually abused. They were acting in a sexually inappropriate manner for children their ages, including masturbating in public. They were both seen at the Child Guidance Clinic in New London. Initially, the focus in treatment was to reduce their sexual behaviors, reduce oppositional behaviors and generally stabilize these two traumatized children. Later, symptoms of Reactive Attachment Disorder ("RAD") were recognized. RAD is diagnosed in children who, because of a break in attachment to caregivers, particularly before the age of three, are unable to integrate significant others into their own psyches. They fail to develop empathy, guilt and compassion. RAD is often paired with learning disabilities and attention deficit disorders. Children with RAD exhibit a great deal of controlling behavior because they needed to be in control for their own safety. Often RAD children do not like to be touched.
In an effort to address his RAD symptoms, DJ began therapy with Tavit Smith, of the Child Guidance Clinic. Mr. Smith testified credibly that DJ is a very fragile and a very disturbed child. DJ is very aggressive, has a great deal of internal rage, and lacks a capacity to form attachments.[2] He receives extensive services through System of Care, a cooperative venture among a number of agencies to coordinate the services that are needed in the foster home. DJ is taking Ritalin for Attention Deficit Hyperactivity Disorder ("ADHD") and Buspar which helps him control aggressive tendencies. DJ is also diagnosed with Reactive Attachment Disorder and Post Traumatic Stress Disorder ("PTSD"). As an infant, when DJ went into foster care, he would not allow himself to be touched even when being bottle fed.
With regard to respondent father, DJ knows that his biological father is in jail. He has not expressed any interest in seeing his father. He has been in his current foster home for two and a half years. DJ considers his foster mother and father to be his parents. DJ needs stability and consistency, and has a very strong need for life to be predictable. Any change in DJ's life would be difficult for him. He has a tenuous grasp on the idea of permanency. DJ is not a normal child who would benefit from contact with his biological father.[3] DJ needs someone who can set limits and boundaries and "hang in there with them because this is probably one of the tougher things that someone would CT Page 5138 ever deal with in a child." Tr. 1-16-02 at 17.
DJ, born a cocaine baby, also suffers from significant cognitive deficits and is delayed several years. His teachers report that he hardly speaks in school and has difficulty with socialization.
DJ and Tyler's foster mother testified credibly concerning DJ's adjustment to their home. The Court finds that DJ and Tyler are living in a loving and supportive home and that they have lived together in that home since May, 1999. The foster family has gone to great lengths to provide the care DJ needs. Although it is not easy, his foster mother is committed to DJ, loves him and is able to persevere under difficult circumstances to provide consistency and stability for DJ. She is committed to participating in the therapy that she and DJ receive together. The foster mother also remains committed to Anthony, even though it was not possible to keep him in their home. He has regular phone contact with his brothers and the foster family, all of whom have visited him since he left their home.
Anthony has had a very difficult time in placement. Anthony was originally placed with DJ and Tyler in the same foster home on May 10, 1999. His behaviors became increasingly difficult and included extreme aggression toward his brothers.[4] On November 2, 2000, at six years of age, Anthony was threatening to kill himself with a knife and foster mother was having a hard time keeping him out the kitchen. He was taken to Lawrence and Memorial Hospital in New London. He was not admitted, but more intensive in-home priority services were authorized. The next day when he participated in the partial hospitalization program he talked about wanting to kill himself and wanting to hurt himself with knives. He was evaluated again, and this time, hospitalized at St. Francis in Elmcrest. He was there for about two weeks until November 17, 2000 and then returned to the foster home with DJ and Tyler.
In April 2001, the foster mother reported that she could no longer control Anthony's behavior and that he was becoming very assaultive to his siblings. He was hitting, punching and biting them and hitting her. She could not contain him, she called 911, and he was taken to the hospital for an evaluation. He was stabilized, in part because it was late at night and the evaluator did not feel he should be hospitalized. Foster mother took him home again. He reverted to his out of control behavior the next day and was taken to a different hospital. At this time even Anthony agreed that he could not live at the foster home with his brothers. From there he was released to a different foster home where he stayed for two months until his behavior deteriorated again and included significant problems at school. He went through several additional placements including one with a foster parent who had previously cared for CT Page 5139 him who was interested in adopting him. Unfortunately, he disrupted out of each placement within a matter of days or weeks.
On October 9, 2001, Anthony released the emergency brake on the car of the foster mother with whom he was living. Anthony was not in the car, but it rolled down a hill and the car was totaled. Foster mother took Anthony to the Connecticut Children's Medical Center. Following an evaluation there, he was admitted to the Institute of Living ("IOL"). By the time of trial, Anthony had stabilized at the IOL and DCF was in the process of locating a less structured environment for him at a subacute residential type program. Although Anthony was ready to leave the IOL and referrals were made, he had not been placed by the time of trial).[5]
Anthony's primary therapist at the IOL, Jan Tesini, testified. Although the unit at the IOL where Anthony was staying is a psychiatric short-term acute care facility where children generally stay for 7-10 days, Anthony had been there several months as of the time of trial. He attends a highly structured therapeutic school at IOL. His primary diagnosis is PTSD, with additional diagnoses of ADHD and RAD. He takes medications including Adderal, Risperdal and Tegerol.
Although Anthony told his therapist he did not remember his biological father and did not want to see him, he did state on one occasion that he wished he could see his father whom he described as his "Daddy Donald, who didn't hurt me." At the same time, however, he asked when he was going to be adopted and did not ask for his father again. With regard to the possibility of a relationship between Anthony and respondent father, Ms. Tesini testified credibly that "for Anthony at this point, close to 8 years old and after all of his different placements and caregivers, that if he were to begin to see his father and then his father were not able to continue that in a nurturing, safe parenting relationship, it would be devastating for Anthony . . . More so than with any other caregiver because I think he would have put so much hope into that relationship being a parent." In her view, respondent father would need to be living independently, continuing in recovery and maintaining employment for probably six months to a year to show that he was stable and able to parent before visitation could begin. She also credibly testified that she believed that after a period of being in a subacute facility or program with an appropriate family resource and all of the services that Anthony has a good chance of transitioning into a family.
Both boys continue to have many special needs as a result of the severe neglect and abuse (including physical and sexual abuse) to which they were subjected and have been on medication and in therapy since June, 1999. The boys' therapists agree that it would not be appropriate to place Anthony back into the foster home with his siblings at this time and CT Page 5140 that he will need a family where there are no other children in the home.
Respondent Father
Respondent father, Donald M., was born May 4, 1959. By the time he was 13, he was significantly involved in drug use and criminal activity. He left school at the age of 16 and at 16 he was sentenced to serve 33 months incarceration on federal firearms charges. Respondent father started smoking marijuana when he was 13 and by 21 years of age, he was smoking marijuana on a daily basis. He was using cocaine or crack three times a week by the time he was 35 and began using heroin at 38, at one time using up to six bags a day.
Although he was married with two children, in 1992, he met Michelle L., then 19, and left his wife for her. Respondent father was incarcerated on July 16, 1996 in connection with a number of convictions on burglary charges. During his incarceration from July, 1996 through May 1997, he was afforded monthly supervised visits with Anthony and DJ at the correctional facility. When respondent father was released in May 1997, he had weekly visitation at DCF initially and then at other locations including Burger King and his father's house. After respondent father confronted Michelle L. at a visit at the Burger King, visitation was moved to DCF. Respondent father did not like visitation there, found it too disruptive and said he would rather have no visitation at all than have it at the DCF office. Respondent father did not object to the boys' return to their mother under the order of protective supervision, as long as he continued to have visitation. Although he was offered supervised visitation at that time, he declined, stating that he would pursue visitation through mother. When Michelle and Reme left Connecticut in March, 1998, respondent father called DCF angry at that development and made unsuccessful efforts to try to locate them.
Respondent father has not seen Anthony and DJ in over four years since January, 1998 when the boys were almost 4 and 2 1/2 years of age. At that time, they had already spent much of their lives in foster care. He has never really provided day-today care for his sons for any significant period of time. Respondent father admitted that during the short time the boys were in the care of both parents, he and Michelle were abusing drugs and alcohol. He conceded to Dr. Grant-Hall, who conducted a psychological examination, that the cocaine use probably did have a negative impact on the children, but did not believe that his marijuana use affected them. Both boys initially entered DCF care (when they were seven and four months old) due to and drug abuse. Respondent father spent much of their lives incarcerated as a result of extensive criminal activity, thereby making himself unavailable to serve as a parent. Indeed, his criminal CT Page 5141 record reflects a life of crime extending over 24 years and including approximately 40 criminal convictions. (Ex. 3)
Most recently, respondent father has been incarcerated since March, 1999 serving a sentence of 12 years, suspended after six years to serve, on charges of larceny in the first degree and possession of narcotics. At the time of trial, respondent father had been designated to a halfway house from which he expects to be released in June, 2002. While incarcerated, respondent father completed an intensive six month drug treatment program at Brooklyn Correctional Institution. He was a peer mentor for Tier III, an advanced drug program within the Department of Correction, ("DOC"), helping other inmates going through the DOC drug treatment program. He was not aware of the extent of the difficulties both boys were having and the specialized needs they presented. He had no plan to provide for their specialized needs on a day-to-day basis. He did send letters to DCF for the boys, but the letters were not delivered in view of the therapists' concerns about attempting to reestablish a relationship under the circumstances. Respondent father loves his sons and wishes to have a greater role in their lives when he is released from incarceration.
The specific steps issued by the court on May 12, 1999 to facilitate reunification required that respondent father keep all appointments set by or with DCF, cooperate with DCF home visits, announced or unannounced, and visits by the child's court appointed attorney and/or guardian ad item; keep children's whereabouts and your own whereabouts known to DCF, your attorney and the attorney for the children; participate in counseling and make progress toward the identified treatment goals; accept and cooperate with in-home support services referred by DCF and make progress toward the identified goals; submit to substance abuse assessment and follow recommendations regarding treatment; successfully complete substance abuse treatment including in-patient treatment if necessary and follow recommendations regarding after care treatment, including relapse prevention; submit to random drug testing; time and method of testing shall be at the discretion of DCF; sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation and progress toward identified goals, and for future use in proceedings before the court; secure and/or maintain adequate housing and legal income; no substance abuse; no involvement/further involvement with the criminal justice system. Consistently and timely meet and address the children's physical educational medical or emotional needs, including, but not limited to, keeping the children's appointments with their medical, psychological, psychiatric, or educational providers; make all necessary child care arrangements, insuring that the children are adequately supervised and cared for by appropriate caretakers; immediately advise DCF of any CT Page 5142 changes in the composition of the household to insure that the change does not compromise the health and safety of the children; maintain the children in the State of Connecticut; the children may travel outside the State of Connecticut only if respondent obtains authorization from DCF or the Court in advance.
In terms of compliance with these steps, many of them were inapplicable while respondent was incarcerated. of those that applied, however, respondent failed on two occasions to notify DCF when his place of incarceration was changed. He did complete the DOC's Tier I, a six session substance abuse education program on June 30, 1999. He also completed the Tier IV, six month intensive drug treatment program within the DOC in November, 2000. He had a substance abuse evaluation at Brooklyn Correctional Institution which showed a substance abuse treatment needs score of T-4. T-4 indicates a severe, long standing addiction problem.
Respondent has had significant involvement with the criminal justice system. Respondent was arrested on June 24, 1999 on charges including larceny in the second degree. On November 23, 1999 he was convicted on one count of larceny in the second degree and several burglary and larceny charges were resolved in a disposition that included five years in jail, concurrent. Thus, although respondent has complied with some of the specific steps, he has not complied with all of them.
Psychological Evaluation
In December, 1999, Robin Grant-Hall, Ph.D., performed a psychological evaluation of respondent father. She did not conduct an interactional evaluation with respondent father and the boys because at the time of the first evaluation, both boys were completely out of control as a result of the trauma they had experienced. They were severely disturbed and dysfunctional and had just recently revealed the abuse by their mother and Reme L. They told Dr. Grant-Hall they did not have any memory of their father. The goal at the time was to stabilize the boys so that they could function in the home and at school, and Dr. Grant-Hall believed that introducing this parent figure at that time was inappropriate. By the time of Dr. Grant-Hall's second evaluation, completed in June 2001, DJ, though still fragile, had stabilized enough to be able to function in school and at home, but Anthony had a significant deterioration in his functioning, had disrupted from the foster home and was completely unable to function in school or at home. Anthony was in no position to see a father whom he had not seen for years; and DJ's therapist believed him to be too fragile. Additionally, DJ had no memories of his father and stated that he did not want to see him. Thus, no interactional evaluation took place. CT Page 5143
Dr. Grant-Hall's updated evaluation of respondent father found that he had moderately severe psychological problems. With regard to personal rehabilitation and recovery, she found that respondent father had completed an intensive six month substance abuse program while incarcerated and had participated in a peer counseling group where people talk about their substance abuse difficulties. Dr. Grant-Hall noted that respondent father was on a waiting list for parenting classes. Although respondent father told her that he was a recovering drug addict, according to Grant-Hall, part of recovery includes the ability to realize that there is always a risk of relapse. "And there should be a healthy anxiety or fear about that . . . So, anybody who feels very, very sure about their recovery, you have to question their recovery." Tr. 1-16-02 at p. 102. She indicated that the other part of recovery is being educated and aware of past drug use and the negative impact it has on life and the lives of others, and to begin to address those issues.
Although respondent father did participate in programs toward recovery, Dr. Grant-Hall's concerns about respondent father included that he tended to be grandiose in personality. In her view, he also exhibited a lack of anxiety about coming out of prison in terms of his potential for relapse. Her testing showed him to be very high on the addictive proneness scale. She was also concerned about his minimization of his past drug use and the negative impact it had on his children and his relationship with Michelle L. Ms. L. had described to Dr. Grant-Hall extreme physical violence between her and respondent father. Dr. Grant-Hall concluded: "Even if Mr. M. could eventually lead a stable life, he does not have the cognitive or emotional resources to parent either or both of his boys given their complex problems and special needs." Ex. 5 at p. 22. Dr. Grant-Hall opined that it would take at least one year of sobriety after respondent father is released from prison before father could be a resource for these children. This was consistent with respondent father's own assessment that he would "need about a year to have a good functioning life and then it would be time to bring the kids back into my home with me." Ex. 5 at p. 5. Dr. Grant-Hall concluded "the chances of Mr. M. . . . in any way in the near future being able to be a parent, I think are very slim to nil." Tr. 1-16-02 at p. 108.
Dr. Grant Hall testified that there might be some benefit to Anthony from having some intermittent contact with his biological father, particularly if he were unable to form other attachments because of his extreme needs and his reactive attachment disorder. Id. If he were unable to function in a foster home and were to remain for many years in a residential facility, she saw some benefit to having some parent figure in his life who would acknowledge birthdays and holidays and have occasional supervised visitation. She acknowledged, however, that there CT Page 5144 would be a risk of additional abandonment involved in having respondent father stay in Anthony's life. Although respondent father successfully completed the DOC drug treatment program, even Mr. Caruso, the clinical supervisor of addiction services, who testified on respondent father's behalf, agreed that there is no guarantee that one will stay in recovery once released from the prison system, including a halfway house. Mr. Caruso testified credibly that respondent father's participation in the peer mentoring program was a positive indication of respondent father's desire to overcome his drug addiction. Additionally, as Mr. Feliciano, a DOC substance abuse counselor, testified, respondent was an effective peer mentor and showed concern for other inmates.
II. ADJUDICATION
Each statutory basis set out in General Statutes Section § 17a-112
(j) is an independent ground for termination. The petitioner is required to prove one or more of the two grounds alleged in its petition by clear and convincing evidence. In re Baby Girl B., 224 Conn. 263, 618 A.2d 1
(1992).
A. Location and Reunification § 17a-112 (i) (1):
In order to terminate parental rights, DCF must prove, by clear and convincing evidence, the statutory element requiring "reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." C.G.S. § 17a-112 (j) (1). "Although [n]either the word reasonable nor the word efforts is . . . defined by our legislature or by the federal act from which the requirement was drawn . . . [r]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted; citation omitted.) In re Mariah S.,61 Conn. App. 248, 255, 763 A.2d 71 (2000).
Respondent claims that DCF did not make reasonable efforts to provide reunification services. He argues that DCF did not cooperate in his efforts to maintain visitation and that DCF treated him unfairly and differently than it treated Michelle L. whose parental rights were terminated in November, 2001. He claims that DCF had an obligation to try to address through the boys' therapy the relationship they had with their father before they left Connecticut in 1998. By addressing the relationship in therapy, he claims visitation could have resumed and he would then have had an opportunity to attempt to reestablish a relationship with them. He claims that DCF's failure to provide visitation on the boys' return amounted to a failure to make reasonable CT Page 5145 efforts to reunify.
This argument must fail for several reasons: First, the decision not to permit visitation was based on the recommendations of the therapists of these two highly traumatized boys. Visitation was addressed twice through administrative hearings. As Dr. Grant-Hall testified, introducing a parent figure would not have been appropriate. This parent had not provided day to day care for the boys before, and was still incarcerated. The boys did not speak about "Daddy Donald" much if at all and were not asking to see him. DJ had no real recollection of him at all, except to acknowledge that he had a "Daddy Donald" and that he was in jail. The decision not to initiate a relationship through visitation, particularly where the boys were suffering from Reactive Attachment Disorder, was reasonable. Second, the relationship these two very young children had with their father before their mother took them out of state in 1998 was one of limited visitation only. Both boys had lived in foster care most of their lives, with Anthony having been taken from father and mother's care when he was seven months old and DJ removed at four months of age. Part of the time the visits were held monthly at the correctional facility where respondent father was incarcerated. When father was not in custody, he lost his ability to have weekly visits by confronting mother and by refusing to visit his sons at DCF. Thus at the time they left the state, the relationship respondent had with his sons was not one in which he was meeting the day to day needs of the children or one in which the boys looked to him to have their needs met in any way. Third, contrary to respondent's assertion, it is reasonable that these two very young, traumatized boys might not remember their father whom they had seen only periodically. Anthony was 4 and DJ was 2 1/2 when they last saw him. After seeing respondent in January, 1998, they then spent approximately 16 months in a highly abusive setting. This occurred after they had already been in foster homes since they were just a few months old.
While a respondent parent is imprisoned, DCF is effectively excused from providing reunification services to the parent other than visitation. See generally In re Roshawn R., 51 Conn. App. 44, 56-57,720 A.2d 1112 (1998) (together with other factors, respondent's incarceration prevented DCF from providing reunification services). For a review of Superior Court cases applying this rule see In re Destiny Q., Superior Court, Juvenile Matters, Child Protection Session, Docket No. U06-CP98-002230-A (Nov. 19, 2001, Levin, J.). Pursuant to C.G.S. §18-81, the Commissioner of Correction is responsible for providing "treatment, vocational and academic education" programs to inmates incarcerated in Connecticut. Here, the respondent took full advantage of the DOC programs and it was virtually impossible for DCF to provide services other than visitation. It would have been unreasonable to require DCF to provide visitation after the boys returned to Connecticut CT Page 5146 and DCF care in a highly traumatized state. The children's therapists agreed that visitation at a correctional facility with a father they had not seen for many months at that time and with whom they had not lived since they were four and seven months old, would have been far too disruptive of efforts to stabilize these fragile boys. DCF's decision, as affirmed after two administrative hearings, was based on the therapists recommendations and was completely reasonable.
Respondent argues that DCF acted with prejudice against respondent when it treated Michelle L. differently than it treated respondent father. As respondent acknowledges, however, there is simply no requirement that parents be treated similarly by DCF when their circumstances are different. (Respondent's Brief at p. 9.) With regard to visitation, Michelle, who had been the custodial parent, was afforded supervised visitation, despite the abuse the children suffered, as recommended by the childrens' therapists. Respondent, who was incarcerated, was not afforded visitation, again as recommended by the therapists. Although respondent father complained that DCF contemplated giving Michelle a good-bye visit with the three children upon termination of her parental rights, there was no evidence that father asked for or was denied a good-bye visit. Indeed, a good-bye visit would be irrelevant since respondent father was contesting termination of his parental rights. Michelle was reunified with the boys in 1997 and respondent father was not. Respondent supported the return of the children to mother as long as he was given visitation. He refused visitation at DCF, however, choosing to pursue visitation through Michelle. Thus, to the extent Michelle L. was treated somewhat differently, it was due only to the different circumstances each parent presented. Father's circumstances were those of his own making. Therefore, contrary to respondent's assertion, there was no pattern of prejudice against respondent father and no effort to make reunification impossible.
Moreover, the court (Mack, J.) made a finding on September 20, 2000 that further efforts to reunify the children with respondent father were no longer appropriate. Under the statute, a finding that reasonable efforts were made is not required if the court has determined, as in this case, that reasonable efforts are no longer appropriate. 17 C.G.S. § 112(j) (1); In re Gary B., 66 Conn. App. 286, 290-91, 784 A.2d 412
(2001).
Additionally, the Court finds by clear and convincing evidence it has been proved that respondent father is unable or unwilling to benefit from reunification efforts. By virtue of the length of his periods of incarceration, his conduct when not incarcerated, and considering the emotional needs of these children, the respondent is unable to benefit from reunification efforts. Reunification efforts were made when Anthony CT Page 5147 was originally removed as an infant from mother and father in 1994. Efforts to reunify Anthony with his parents failed when his brother DJ was born with cocaine in his system in 1995. Shortly thereafter, DJ was removed as well after having been subjected to abuse and neglect and abandoned following a domestic violence incident between mother and father. Efforts to reunify continued, resulting in the boys' return to their mother under an order of protective supervision in 1997. At that time, mother and father had permanently separated and respondent had elected to pursue visitation through Michelle. Because of respondent father's failure to take full advantage of visitation when he was not incarcerated, and his continued violations of the law resulting in further incarceration, the court finds that he was unable or unwilling to benefit from reunification efforts.
B. Failure to Rehabilitate — § 17A-112(j) (3) (B) (i)
The Court finds that the petitioner has established by clear and convincing evidence that respondent father Donald M. has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the ages and special needs of the children, he could assume a responsible position in the lives of his children, who were adjudicated neglected on August 25, 1999.
"`Personal rehabilitation as used in [Section 17a-112] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [The statute] requires the trial court . . . to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that [within a reasonable time] she can assume a responsible position in her child's life.' (Citations omitted; internal quotation marks omitted). In re Eden F., [250 Conn. 674, 706, 741 A.2d 873
(1999)]. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue. (Internal quotation marks omitted). In reShyliesh H., [56 Conn. App. 167, 180, 743 A.2d 165 (1999)]." In re SarahAnn K., 57 Conn. App. 441, 448, 749 A.2d 77 (2000). See also In re AshleyS., 61 Conn. App. 658, 665, 769 A.2d 718, cert. denied, 255 Conn. 950
(2001); In re Amneris P., 66 Conn. App. 377, 384-85, 784 A.2d 457
(2000).
The court finds by clear and convincing evidence that respondent has not achieved a sufficient degree of rehabilitation as would encourage the belief that within a reasonable time, considering the ages and extreme special needs of the children, he could assume a responsible position in CT Page 5148 Anthony and DJ's lives. See In re Daniel C., 63 Conn. App. 354; In reAshley S., 61 Conn. App. at 665; In re Sarah Ann K.,57 Conn. App. at 448. "The psychological testimony from professionals is rightly accorded great weight in termination proceedings." (Internal quotation marks and citation omitted.) In re John G., 56 Conn. App. 12, 24, 740 A.2d 496
(1999). The psychological evidence in this case clearly establishes that respondent father has not achieved § 17a-112 (j) (3) (B) rehabilitation. Dr. Grant-Hall was unequivocal in her opinion that respondent could not provide day to day care for Anthony and DJ. She testified credibly that "[e]ven if Mr. M. could eventually lead a stable life, he does not have the cognitive or emotional resources to parent either or both of his boys given their complex problems and special needs." Ex. 5 at p. 22.
The court concludes by clear and convincing evidence, that as of the adjudicatory date of January 8, 2001, respondent had not brought himself into a position in which he could provide adequate care for Anthony and DJ. The court must also consider whether events after the adjudicatory date establish "a degree of rehabilitation that is sufficient to foresee that [respondent father] may resume a useful role in the child's life within a reasonable time." In re Stanley D., 61 Conn. App. 223, 230,763 A.2d 83 (2000); In re Latifa K., 67 Conn. App. at 749-50
(acknowledging that the court could take facts into account from beyond the adjudicatory period in making its decision in the adjudicatory phase with regard to whether the degree of rehabilitation was sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time.) After the adjudicatory date, and up to the time of trial, respondent father completed the Tier III program and remained involved in a DOC aftercare program. He was designated to a halfway house shortly before trial. Even considering these events, respondent father was still not in a position to assume a useful role in the lives of his children in view of their special needs.
Rehabilitation must be foreseeable within a reasonable time. In reSheila J., 62 Conn. App. 470, 479-80, 771 A.2d 244 (2001). "What constitutes a reasonable time is a factual determination that must be made on a case-by-case basis." In re Stanley D., 61 Conn. App. at 231
(quoting In re Michael L., 56 Conn. App. 688, 694, 745 A.2d 847 (2000). Here, for two very troubled children who have not lived with their father since they were infants, the time necessary for sufficient rehabilitation even under the best of circumstances is not reasonable. As to DJ, he now has the stability of a wonderful foster home with his half-sibling Tyler and foster parents who would like to adopt him. As to Anthony, he deserves the opportunity for permanency through adoption. And in this case, rehabilitation itself remains speculative and contingent on respondent father's ability to remain drug and crime-free after his CT Page 5149 release from the structure of incarceration, something respondent father has been unable to do since the time his sons were born. Much of the time his sons were in DCF care or in the care of their mother and stepfather, respondent father was unavailable to serve as a parent to them as a result of his drug addiction and criminal conduct.
Respondent father has taken a significant step in his recovery. However, his ability to manage even his own life following his release is uncertain. As his DOC substance abuse counselors affirm, respondent has come a long way from his six bag a day heroin habit in terms of his desire and motivation to remain drug-free. While he is to be commended for taking this significant step, the court agrees with petitioner that respondent has taken the first step of what will be a lifelong road to rehabilitation and recovery. The court finds that respondent is not in a position to provide day to day care for his sons or to assume a useful role in their lives and that he has not achieved rehabilitation as would encourage the belief that he will be in such a position within a reasonable time. According to Dr. Grant-Hall's estimate, it would take at least one year of sobriety after respondent father is released from prison before he could be a resource for these children.[6] The therapist from IOL, Ms. Tesini, testified that respondent father would need at least 6 months to a year of sobriety to establish that he was well enough to begin a relationship with Anthony. Respondent father himself thought he would need about a year. Under the circumstances of this case, a year does not constitute a reasonable time for these children to wait for permanency. This is particularly so where the one year is contingent upon father continuing in recovery, remaining drug free and complying with the law.
In assessing rehabilitation, "[t]he critical issue is whether the parent has gained the ability to care for the particular needs of the child at issue." In re Mariah S., 61 Conn. App. at 261; accord, In reGary B., 66 Conn. App. at 292; In re Amneris P., 66 Conn. App. 377,384-85, 784 A.2d 457 (2001). The issue is not whether respondent has improved his ability to manage his own life, but rather whether he has gained the ability to care for the particular needs of Anthony and DJ. Inre Shyliesh H., 56 Conn. App. 167, 180, 743 A.2d 165 (1999); In re SarahAnn K., 57 Conn. App. at 448. Anthony and DJ both have severe special needs, and will require at a minimum, therapy and medication for many years. Expressing love for the children and visiting with them is vastly different from being able to care for the particular special needs of these children on a day-to-day basis. Anthony and DJ have been in care for most of their lives with no interaction with their father for over four years since January, 1998.
As Judge Brenneman stated in In re Samantha B., 45 Conn. Sup. 468, CT Page 5150722 A.2d 300 (1997), aff'd, 51 Conn. App. 376, 721 A.2d 1255 (1998), "Terminating a parent's rights is not ordered to punish a parent who has not tried to rehabilitate; it is ordered so as not to punish a child by denying her a safe, permanent home with proven competent care-takers because her biological mother has tried hard but continues to be incapable of providing such a home for her." Here, respondent has tried to rehabilitate, but has done so insufficiently to be in a position to provide day to day care for either of these children within a reasonable time. DJ now has lived for much of his young life with a loving foster family which is committed to him, with whom he has thoroughly bonded and which would like to adopt him. Although Anthony's circumstances are different in that his special needs are greater than DJ's and he is not in a pre-adoptive home, he too deserves an opportunity for permanency.
Thus, in its totality, the clear and convincing evidence compels the conclusion that despite his progress toward rehabilitation, respondent remains unable to successfully parent Anthony and DJ and lacks the ability to assume a responsible position in their lives within a reasonably foreseeable time in the future. Accordingly, based on the clear and convincing evidence presented in this case, the court finds that the petitioner has proved respondents' failure to achieve rehabilitation pursuant to § 17a-112 (j) (3) (B).
C. No Ongoing Parent-child Relationship — § 17A-112(j) (3) (D):
This ground is established when there is no ongoing parent-child relationship with the parent, which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing day to day basis the physical, emotional, moral and educational needs of the child and where allowing further time for the establishment of the parent-child relationship would be detrimental to the best interest of the child.
No ongoing parent-child relationship contemplates "a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or [the child] has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal(Anonymous), 181 Conn. 638, 645-46 (1980); In re John G., 56 Conn. App. 12,22, 740 A.2d 496 (1999). In any case, "the ultimate question is whether the child has no present memories or feelings for the natural parent." Inre Juvenile Appeal, (Anonymous), 177 Conn. 648, 670 (1979). The mere recognition of an individual as a parent will not defeat this ground. Inre Juvenile Appeal (84-6), 2 Conn. App. 705, 708-09 (1984), cert.denied, 195 Conn. 801 (1985). The presence or absence of positive feelings on the part of the child is determinative. In re Shane P., 58 CT Page 5151 Conn. App. at 240.
In the adjudicatory phase, the petitioner must establish (1) that no ongoing parent-child relationship exists; and (2) that the allowance of further time for the establishment of such a relationship would harm the interests of the child. In re Jonathan G., 63 Conn. App. 516, 525
(2001).
The Court finds by clear and convincing evidence that there is no ongoing parent-child relationship between the children and respondent father. Respondent has not seen his children in over four years. Anthony was in DCF care for three days in July, 1994 and then from September, 1994 through December, 1997, and from May, 1999 to the present, a total of almost six years, and DJ has been in care for close to five years. During much of that time, respondent father was incarcerated as a result of his extensive criminal conduct. During the time he was not incarcerated, he lost visitation because he was unable to conduct himself appropriately when he met mother at the Burger King. Further, when he was offered visitation at DCF, he refused. Although he blames the confrontation at the Burger King on DCF for scheduling his and Michelle's supervised visitations at the same location, his blame is misplaced. The record clearly establishes that the visitation was scheduled at the same location to accommodate the children who already had to travel a long distance for the visitation. He also blames DCF for moving the visitation to a place that was not conducive to his interaction with his sons because of the presence of other children and toys. Again, his blame is misplaced. It was not unreasonable for DCF to schedule the visits at the DCF office. Respondent did send letters to DCF which were not given to the boys based on the therapists' recommendations. Even if the letters had been delivered, letters from a father to a child who does not know him and who has been in a therapeutic foster home or a psychiatric facility after having been subjected to neglect and abuse, are not sufficient to establish a parent-child relationship. Respondent father did attempt to secure visitation which was not possible based on the fragility of his sons.
Anthony and Donald last saw their father in January, 1998 when they were 4 and 2 1/2 years old. Although in a different case, mother's removal of the children to another state might affect the court's determination, here father's conduct before, during and after that time supports the court's conclusion. As a result of his drug addiction and criminal conduct, respondent was arrested a number of times during the time the children were out of state. Due to circumstances of respondent's own making, he was incarcerated serving a 12 year sentence, suspended after 6 years to serve, when the boys returned to Connecticut and was not available to them. The boys were far too traumatized and suffering from CT Page 5152 reactive attachment disorder, in addition to post traumatic stress disorder and others, in order to require them to attend visitation sessions at a correctional facility with a father they barely knew.
Certainly DJ would not recognize Donald M. as a parent in that he would not seek comfort from him or go to him to have his needs met. DJ was removed from his father and mother's care when he was 4 months old. He had limited visitation with respondent from the time he was 4 months old until he was 2 1/2. When DJ was returned to DCF care approximately 16 months later and after being subjected to severe abuse, he did not indicate any desire to see him or any present memories of his biological father who remained incarcerated. Anthony was almost four when he last saw his father. He is now 8. Although Anthony initially told his therapist that he did not remember Daddy Donald and that he did not wish to see him, he did later state that he remembered his father and asked to see him. At the same time, however, he also asked when he was going to be adopted. Although respondent father is well-intentioned to the extent that he expresses his love for his sons and a desire to care for them when he can, the fact remains that he has not been a significant part of their lives since birth. As a result of his drug addiction and his criminal conduct, which led to his lengthy incarcerations, respondent father has rendered himself unavailable to serve as a parent for Anthony and DJ. See In re Shane P., 58 Conn. App. 234, 241 (2000). Even when he was not incarcerated, he did not make sufficient efforts to establish a parenting relationship with Anthony and DJ. His inappropriate confrontation at visitation resulted in lost visitation. His continued criminal conduct rendered him unavailable for his sons in 1999 when they returned. Respondent father has almost never met on a day to day basis the physical, emotional, moral or educational needs of these children. Inre Jonathan G., 63 Conn. App. 525. With Anthony, respondent did have an opportunity to maintain a parent-child relationship with him when he was returned to his parents after three days in DCF care in July, 1994, but respondent's conduct and substance abuse issues did not improve and Anthony was placed in care again.
Respondent cites In re Valerie D., 223 Conn. 492, 613 A.2d 748 (1992) for the proposition that DCF's refusal to allow visitation led to the lack of a relationship with father. In In re Valerie D., our Supreme Court held that where the state has acted to prevent a parent-child relationship, "the inquiry must focus, not on the feelings of the infant, but on the positive feelings of the natural parent." The Appellate Court has distinguished Valerie D., a case involving the development of a parent-child relationship in the earliest stages of the child's life, from cases where "the respondent, rather than the state, created the circumstances that caused or perpetuated the lack of an ongoing relationship between the respondent and [the child]." In reCT Page 5153Alexander C., 67 Conn. App. 417, 424, 787 A.2d 608 (2001), cert.granted, 259 Conn. 927, ___ A.2d ___ (2002). See In re Amelia W.,62 Conn. App. 500, 507, 772 A.2d 619 (2001); In re Shane P.,58 Conn. App. 234. Here, respondent's own actions created and perpetuated the lack of a relationship with his sons who were 8 and 6 at the time of trial.
Respondent asserts that because Anthony stated that he wanted to see his father, "this connotes both memory of respondent and feelings of a positive nature on the part of the child as discussed in In re TabithaT., 51 Conn. App. 595, 602, 722 A.2d 1232 (1999). Here, however, one mention of respondent father over a course of treatment spanning months, does not constitute sufficient feelings of a positive nature to establish an on-going parent-child relationship. Clearly, Anthony at the same time was wondering when he was going to be adopted and never mentioned respondent father again. As set forth above, mere recognition of an individual as a parent will not defeat this ground. In re Juvenile Appeal(84-6), 2 Conn. App. at 708-09. DJ did not ask to see respondent father and specifically stated that he did not want to see respondent even once.
The court further finds by clear and convincing evidence that to allow respondent father further time for the establishment of a parent-child relationship with Anthony and DJ, who does not know him, would be detrimental to the best interest of the children. They are now 8 and 6 years old and suffering from the effects of having been physically and sexually abused by their mother and stepfather. DJ is in the same wonderful foster home he has lived in since 1999. The only father figure he has ever known, other than his foster father whom he calls Daddy, is his stepfather who abused him.
With regard to Anthony, his extreme special needs have resulted in his many hospitalizations, culminating in a hospitalization at the IOL for many months. By his own testimony, respondent father, who has spent much of his sons' lives incarcerated, will be released from custody soon. He will be attempting to maintain a drug and crime-free life once again. Although his previous efforts to remain drug and crime-free have failed, this time respondent father has completed an intensive DOC drug treatment program during his last incarceration and is to be commended for those efforts. However, as the testimony clearly and convincingly established, Anthony would be devastated if respondent father were to attempt a parent-child relationship with him and then essentially abandon Anthony again by relapsing into drug use and/or crime such that he would be unavailable once again to parent Anthony. This is a child who requires many medications and intensive therapy just to be able to function even in an institutional setting, let alone a home or school setting. In view CT Page 5154 of DJ and Anthony's needs, the court finds by clear and convincing evidence that it would be detrimental to them to allow any further time in which respondent father could attempt to develop a parent-child relationship.
Thus, the Court finds that the petitioner has proven both statutory grounds for termination as to respondent Donald M. by clear and convincing evidence.
III. DISPOSITION
As to the dispositional phase of this hearing on the petition for termination of parental rights, the court has considered the evidence and testimony related to circumstances and events up to and including January 17, 2001, the date upon which the evidence in this matter was completed.[7] With respect to the seven written factual findings required by C.G.S. § 17a-112 (k), each of which the court has considered in determining whether to terminate parental rights under this section, the court makes the following findings:
(1) As to the timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with respondent, the court finds by clear and convincing evidence that services, including visitation, were offered during some of the time the children were in DCF care. At other times, as set forth above, services were not offered due to respondent's incarceration and the boys' fragile state. Further, Donald M. was unable to benefit from reunification efforts.
(2) As to whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, the court finds by clear and convincing evidence that Donald M. has demonstrated that he is unable or unwilling to benefit from reunification efforts. C.G.S. § 17a-112 (c) (1). The court made a finding on September 20, 2000 that further efforts to reunify were no longer appropriate.
(3) As to the extent to which all parties have fulfilled their obligations under the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, the court finds that specific steps were ordered as to respondent father, some of which were complied with and some of which were not. DCF has fulfilled any obligations it had in order to facilitate reunification of the family. CT Page 5155
(4) As to the feelings and emotional ties of the children with respect to their parents, any guardian, and any person who has exercised physical care, custody or control of them for at least one year and with whom they have developed significant emotional ties, the court finds by clear and convincing evidence that Anthony and DJ do not have an emotional bond with respondent father and do not know him as a parent. He has been incarcerated for a substantial portion of their lives. When he was not incarcerated and arranged to visit with them, he turned the visit into a confrontation with respondent mother. He was offered visitation at a DCF location and refused. The boys do not recognize him as a parent in the sense that they would not seek comfort from him or go to him to have their needs met. Although Anthony and DJ are aware that they have a biological father, ("Daddy Donald"), he has not been a significant part of their lives. While Anthony asked for respondent father on one occasion, he does not speak of him and has not asked to see him since. DJ has no real memories of respondent father and does not speak of him at all.
The only feelings Anthony and DJ have for their stepfather, Reme L., are extremely negative as they clearly identify him as their abuser. Both boys have expressed a killing rage toward him.
Anthony has mixed memories of his mother. He cannot understand how she participated in and allowed the abuse to occur. DJ remembers his mother, whom he calls Michelle, as a person in his past.
DJ views his foster parents as his "real" parents and has strong emotional ties to them and to Tyler. They have expressed a desire to adopt DJ and Tyler. DJ and Tyler have been with them for almost three years. The evidence reveals that they have adjusted well to their surroundings and to their foster family. The Court finds that the foster parents are providing the physical, emotional and educational support DJ needs. They also continue to be supportive of Anthony and have facilitated sibling contact to the extent possible.
Anthony has had significant problems in placements and has severe special needs. The placement with his siblings was unsuccessful. He still, however, has an emotional bond to his brother and half-brother and the foster family they live with. He has spoken to them by phone and has had visitation with them.
(5) As to the ages of the children, the court finds that Anthony is now 8 years of age; and DJ is 6. The Court further finds, as shown by clear and convincing evidence, that these children require stability of placement and continuity of care and that the children's attorney recommends termination.[8]
CT Page 5156
(6) As to the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; the court finds by clear and convincing evidence that respondent father has attempted to establish contact with the children, which has not been possible given the extent of the trauma they experienced, their fragile state, and his incarceration. Father last saw the children in January, 1998. He has inquired about the children's well being and has sent cards for them to DCF. He has made efforts to obtain visitation. The court further finds that in view of his incarceration, and his drug addiction, respondent has been unable to make realistic and sustained efforts to conform his conduct to even minimally acceptable parental standards since his sons were born. Giving him additional time would not likely bring his performance, as a parent, within acceptable standards sufficient to make it in the best interests of the child to be reunited. In re Luis C. 210 Conn. 157 (1989); In re Juvenile Appeal,183 Conn. 11, 15 (1981). This is particularly true here where the children have severe special needs.
(7) As to the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent, the court finds by clear and convincing evidence that no unreasonable conduct by the child protection agency, or foster parents is noted. For the period from March, 1998 through April, 1999, the children's mother removed them from the state and did not inform respondent or DCF of their whereabouts. While this conduct was a significant factor in father's inability to have a meaningful relationship with his children at that time, respondent's own conduct, before, during and after that time, was on balance the overriding factor in his overall inability to maintain a meaningful relationship with his sons. Further, economic factors did not prevent regular, continuing contact with the children.
With respect to the best interests of the child contemplated by C.G.S. § 17a-112 (j) (2), by clear and convincing evidence, and based upon all of the foregoing, the court finds that termination of the parental rights of Donald M. is in the best interest of the children. These findings are made after considering the totality of circumstances including the children's sense of time and the children's need for a CT Page 5157 secure and permanent environment. Anthony and DJ have been in DCF care for much of their young lives. When they were not in care, they suffered severe abuse and neglect. Respondent father was not available for his sons when they needed him as a result of his drug addiction and lifelong criminal activities. Permanency, consistency and stability are crucial for Anthony and DJ. While respondent loves his sons and desires to care for them, he has been consistently unable to assume a responsible parental role. According to Dr. Grant-Hall, respondent does not have the cognitive or emotional resources to parent either or both of his boys given their complex problems and special needs. Even though respondent has taken a significant step in his ability to manage his own life, he is not in a position to provide day to day care for Anthony and/or DJ. The Court again acknowledges the quality of care that DJ is receiving in his foster home which is able to address his specialized needs and his attachment to his foster parents, and the great need that Anthony has for permanency.
It is accordingly, ORDERED that the parental rights of Donald M. are hereby terminated as to the children Anthony and Donald. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent of Anthony and DJ for the purpose of securing an adoptive family or other permanent placement for the children.
A permanency plan shall be submitted within 30 days of this judgment, and that such further reports shall be timely presented to the court as required by law.
Judgment may enter accordingly.
It is so ordered this 29th day of April, 2002.
Jongbloed, J.